**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 16 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTAHNS FOR BETTER
TRANSPORTATION; ROSS C.
"ROCKY" ANDERSON, in his official
capacity as Mayor of Salt Lake City, Utah;
PAUL C. HUNTER; ROSEMARIE M.
HUNTER,

      Plaintiffs,

   and

SIERRA CLUB,

      Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION; NORMAN
MINETA, Secretary, United States
Department of Transportation; FEDERAL
HIGHWAY ADMINISTRATION;
MARY E. PETERS, Administrator,
Federal Highway Administration; DAVID
GIBBS,  Division Administrator of the
Utah Division of the Federal Highway
Administration; U.S. ARMY CORPS OF
ENGINEERS; MICHAEL J. CONRAD,
Colonel, District Engineer of the
Sacramento District; BROOKS CARTER,
Chief of the Intermountain Regulatory
Section; FEDERAL TRANSIT
ADMINISTRATION; JENNIFER L.
DORN, Administrator of the Federal

No. 01-4216

Transit Administration; LEE
WADDLETON, Regional Administrator
of the Federal Transit Administration and
his successor,

Defendants - Appellees.

------------------------

STATE OF UTAH; UTAH
DEPARTMENT OF
TRANSPORTATION,

Intervenors.

UTAHNS FOR BETTER
TRANSPORTATION,

Plaintiff - Appellant,

and

ROSS C. "ROCKY" ANDERSON, in his
official capacity as Mayor of Salt Lake
City, Utah; SIERRA CLUB; PAUL C.
HUNTER; ROSEMARIE M. HUNTER,

Plaintiffs,

v.                                          No. 01-4217

UNITED STATES DEPARTMENT OF
TRANSPORTATION; FEDERAL
HIGHWAY ADMINISTRATION;
MARY E. PETERS, Administrator,
Federal Highway Administration; DAVID
GIBBS, Division  Administrator of the
Utah Division of the Federal Highway
Administration; U.S. ARMY CORPS OF

ENGINEERS; MICHAEL J. CONRAD, Colonel, District Engineer of the Sacramento District; BROOKS CARTER, Chief of the Intermountain Regulatory Section; NORMAN MINETA, Secretary of the United States Department of Transportation; FEDERAL TRANSIT ADMINISTRATION; JENNIFER L. DORN, Administrator of the Federal Transit Administration; LEE WADDLETON, Regional Administrator of the Federal Transit Administration and his successor,

        Defendants - Appellees.

------------------------

STATE OF UTAH; UTAH DEPARTMENT OF TRANSPORTATION

        Intervenor.

UTAHNS FOR BETTER TRANSPORTATION; SIERRA CLUB; PAUL C. HUNTER; ROSEMARIE M. HUNTER,

        Plaintiffs,

    and

ROSS C. "ROCKY" ANDERSON, in his official capacity as Mayor of Salt Lake City, Utah,

        Plaintiff - Appellant,

v.                                              No. 01-4220

UNITED STATES DEPARTMENT OF
TRANSPORTATION; NORMAN
MINETA, Secretary, United States
Department of Transportation; FEDERAL
HIGHWAY ADMINISTRATION;
MARY E. PETERS, Administrator,
Federal Highway Administration; DAVID
GIBBS, Division Administrator of the
Utah Division of the Federal Highway
Administration; U.S. ARMY CORPS OF
ENGINEERS; MICHAEL J. CONRAD,
Colonel, District Engineer of the
Sacramento District; BROOKS CARTER,
Chief of the  Intermountain Regulatory
Section; FEDERAL TRANSIT
ADMINISTRATION; JENNIFER L.
DORN, Administrator of the Federal
Transit Administration; LEE
WADDLETON, Regional Administrator
of the Federal Transit Administration and
his successor,

         Defendants - Appellees,


    ------------------------

STATE OF UTAH; UTAH
DEPARTMENT OF
TRANSPORTATION,

         Intervenors.

4

Craig D. Galli (Michael J. Malmquist, and H. Douglas Owens of Parsons Behle & Latimer, Salt Lake City, Utah, and Robert W. Adler, Professor of Law, University of Utah College of Law, for Plaintiff-Appellant Utahns for Better Transportation; Steven W. Dougherty of Anderson & Karrenberg, Salt Lake City, Utah, for Plaintiff-Appellant Ross C. "Rocky" Anderson; Patrick Gallagher, San Francisco, California, and Joro Walker of Land and Water Fund of the Rockies, Salt Lake City, Utah, for Plaintiff-Appellant Sierra Club, with him on the briefs).

Margaret N. Strand of Venable, Baetjer, Howard & Civiletti, LLP, Washington, D. C. for Appellee State of Utah; and Sandra Slack Glover, Attorney, U. S. Department of Justice, Environment & Natural Resources Division, Washington, D. C. for the Federal Appellees (Mark L. Shurtleff, Attorney General, and Thomas A. Mitchell, Assistant Attorney General, State of Utah, for Appellee State of Utah; Thomas L. Sansonetti, Assistant Attorney General; Paul M. Warner, United States Attorney; Carlie Christensen, Assistant United States Attorney; Daniel Pinkston and Clay Samford, Attorneys, U. S. Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Helen Mountford, Office of the Chief Counsel, Federal Highway Administration; and Lisa Clay, Assistant District Counsel, U. S. Army Corps of Engineers, for the Federal Appellees, with them on the brief).

Before **KELLY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

**KELLY**, Circuit Judge.

This appeal arises from the district court's order denying the Appellants' request that the Records of Decision issued by the Federal Highway Administration and the U.S. Army Corps of Engineers (collectively the "Agencies") concerning the Legacy Parkway project be vacated and that the Legacy Parkway Final Environmental Impact Statement be

remanded for further agency action. The district court's jurisdiction was based upon the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06. We have jurisdiction pursuant to 28 U.S.C. § 1291, and review the district court's decision de novo. New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Serv., 248 F.3d 1277, 1281 (10th Cir. 2001). We affirm in part, reverse in part, and remand.

## *Background*

The Great Salt Lake ("GSL") and the wetlands surrounding its shoreline serve as an important habitat for a variety of birds, reptiles, amphibians, and mammals, some of which are endangered. The wetlands of the GSL account for 75 percent of all wetlands in the State of Utah, whose total land area consists of only 1.5 percent wetlands. The shores of the GSL are internationally important because they are a link of the Pacific Flyway for migratory waterfowl and a link of the Western Hemisphere Shorebird Reserve Network ("WHSRN"). Some two to five million birds use the GSL yearly and 90 percent of that use is concentrated in the eastern shore. II Aplt. App. at 639.

By the year 2020, population and travel demand in the five counties along the eastern shore of the GSL is anticipated to increase by 60 percent and 69 percent, respectively. To prepare the transportation infrastructure to meet this future demand, Utah's state, local, and regional officials have developed a three-part plan collectively called "Shared Solution." The plan calls for improving and expanding Interstate 15,

6

expanding transit, and constructing the Legacy Parkway. The Legacy Parkway is to be a four-lane, divided, limited access, state-funded highway. As currently proposed, it is to be 330 feet wide consisting of four lanes, a 65.6-foot median, a 59-foot berm and utility corridor, and a 13.1-foot pedestrian/equestrian/bike trail. It is to start near Salt Lake City ("SLC"), run north along the eastern portion of the GSL, and end fourteen miles later by connecting with US 89. See II Aplee. App. 710 (map).

Because the Legacy Parkway will connect to the interstate highway system and will require filling in 114 acres of wetland, it must receive approval from the Federal Highway Administration ("FHWA")[1] and a § 404(b) permit from the U.S. Army Corps of Engineers ("COE"). Because both the approval and the permit qualify as major federal actions, an Environmental Impact Statement ("EIS") is required. The Utah Department of Transportation ("UDOT") and its private contractors began preparing a Draft Environmental Impact Statement ("DEIS") shortly after plans for a new highway were announced by Utah's governor in July 1996. The FHWA and the COE adopted UDOT's DEIS and issued it for public comment in September 1998. The Final Environmental Impact Statement ("FEIS") was released for public comment in June 2000. In December

---

[1] As Judge Cudahy noted, "policymakers and courts have cooked up enough acronyms under NEPA for a feast of officialese." Simmons v. United States Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). To assist the reader, the court has provided an appendix of the acronyms and shorthand names used in this opinion and in the briefs. See also Aplee. App. at 176-83 (FEIS Acronyms and Abbreviations list). In the future, the court would appreciate it if counsel would do likewise.

2000, UDOT awarded the contract for construction of the Legacy Parkway. On January 9, 2001, the COE released its Record of Decision ("ROD") issuing the § 404(b) permit to UDOT; and, on October 31, 2000, the FHWA issued its ROD approving UDOT's request for additions and modifications of access points to the interstate highway system.

The Appellants, whose complaints were consolidated by the district court, filed an appeal pursuant to the APA from the RODs as final agency actions. The Appellants asked the district court to vacate the FHWA's and COE's RODs that approved construction of the Legacy Parkway, and to order the preparation of a new EIS for the Legacy Parkway. The district court denied the Appellants' request. After the district court decision was certified as an appealable order, the Appellants appealed to this court and sought an Emergency Motion for Injunction Pending Appeal. On a preliminary record, we granted the motion requiring a $50,000.00 bond.

On appeal, Appellants contend that the COE violated the CWA in issuing a permit for the Legacy Parkway where less environmentally damaging "practicable alternatives" existed to the configuration and alignment of the highway. They contend that both the CWA and NEPA were violated when various project impacts were not evaluated correctly and other NEPA requirements were ignored. The Appellants summarize their argument as urging the court to order the Agencies to prepare a new or supplemental EIS and to process a new CWA permit application that adequately addresses the following factors: (1) mass transit alternatives, (2) alternative land use scenarios, (3) land use and

8

growth impacts, (4) impacts on Salt Lake City, (5) wetlands and wildlife impacts, and (6) air quality impacts.  Aplt. Br. at 7, 16-17.

### *Statutory Overview*

The National Environmental Policy Act ("NEPA") requires federal agencies to prepare an EIS prior to taking major federal action.  42 U.S.C. §§ 4321-4370d.  The issuing of either approval of, or a permit for a specific project, when that project's effects are major and are potentially subject to federal control and responsibility, qualifies as major federal action pursuant to 40 C.F.R. § 1508.18(b)(4).[2]  The purpose of NEPA is to require agencies to consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns.  Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 97 (1983); Sierra Club v. United States Dep't of Energy, 287 F.3d 1256, 1262 (10th Cir. 2002).  NEPA prescribes the necessary process, but does not mandate particular results.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989) (As long as the procedural requirements were met, the Forest Service would not have violated NEPA if it decided that the benefits of downhill skiing justified issuance of a special use permit, notwithstanding even 100 percent loss of the mule deer

_____

[2] The Council on Environmental Quality ("CEQ") was given authority to issue regulations implementing the procedural provisions of NEPA that would be binding on all Federal agencies by Executive Order No. 11991 (May 24, 1977).

herd.); Wyoming Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1240 (10th Cir. 2000).

Accordingly, agencies are not required to elevate environmental concerns over other valid

concerns. Baltimore Gas & Elec., 462 U.S. at 97. So long as the record demonstrates

that the agencies in question followed the NEPA procedures, which require agencies to

take a "hard look" at the environmental consequences of the proposed action, the court

will not second-guess the wisdom of the ultimate decision. Robertson, 490 U.S. at 350.

"The role of the courts in reviewing compliance with NEPA 'is simply to ensure that the

agency has adequately considered and disclosed the environmental impact of its actions

and that its decision is not arbitrary and capricious.'" Utah Shared Access Alliance v.

United States Forest Serv., 288 F.3d 1205, 1208 (10th Cir. 2002) (quoting Baltimore Gas,

462 U.S. at 97-98 ). We apply a rule of reason standard (essentially an abuse of

discretion standard) in deciding whether claimed deficiencies in a FEIS are merely

flyspecks, or are significant enough to defeat the goals of informed decisionmaking and

informed public comment. Custer County Action Assoc. v. Garvey, 256 F.3d 1024, 1036,

1040 (10th Cir. 2001); see also Marsh v. Oregon Nat. Resources Council, 490 U.S. 360,

377 n.23 (1989) (noting similarity between the "reasonableness" and "arbitrary and

capricious" standards).

Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, prohibits the

filling or dredging of wetlands without first receiving a § 404(b) permit from the COE.

33 U.S.C. § 1344(a), (d). A permit may not be issued if (i) there is a practicable

10

alternative which would have less adverse impact and does not have other significant adverse environmental consequences, (ii) the discharge will result in significant degradation, (iii) the discharge does not include all appropriate and practicable measures to minimize potential harm, or (iv) there does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the COE's Guidelines for permit issuance. 40 C.F.R. § 230.12(a)(3)(i-iv). For non-water dependent projects, it is presumed that a practicable alternative exists and the burden to clearly demonstrate otherwise is on the applicant. Id. § 230.10(a)(3); Resource Inv's, Inc. v. United States Army Corps of Eng'rs, 151 F.3d 1162, 1167 (9th Cir. 1998). "Practicable" is defined at 40 C.F.R. § 230.10(a)(2) as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." The presumption for a non-water dependent project that a practicable alternative exists is not an automatic bar on issuance of a permit, but it does require that an applicant make a persuasive showing concerning the lack of alternatives. Sylvester v. United States Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir. 1989) (internal citation omitted). Finally, a permit may not be issued "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

For actions subject to NEPA, the analysis of alternatives required for the NEPA environmental documents will in most cases provide the information for the evaluation of

11

alternatives under the CWA Guidelines. See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1526 n.17 (10th Cir. 1992). If, however, the NEPA documents do not consider the alternatives in sufficient detail to respond to the requirements of the Guidelines, it may be necessary to supplement NEPA documents with additional information. 40 C.F.R. § 230.10(a)(4).

The Administrative Procedure Act ("APA") makes final agency action for which there is no other adequate remedy in a court subject to judicial review. 5 U.S.C. § 704. The APA empowers a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In making its determinations, the court shall review the whole record or those parts cited by a party. 5 U.S.C. § 706.

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation. [Sierra Club v. Hodel,] 848 F.2d 1068, 1093 (10th Cir.1988) (emphasis added, quotation omitted), overruled on other grounds, Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 972 (10th Cir.1992) (en banc).

Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1226 (10th Cir. 2002) (NEPA). In this case, both parties have filed appendices, 10th Cir. R. 30, and we decide the case on the basis of the parties' record submissions.

On appeal, this court applies the same standard of review to the record as did the

district court.  <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d 535, 541 (11th Cir. 1996) (CWA).

The APA's arbitrary and capricious standard is a deferential one; administrative

determinations may be set aside only for substantial procedural or substantive reasons,

and the court cannot substitute its judgment for that of the agency.  <u>Id.</u> (CWA).  The

Appellants raise issues under both NEPA, which we address first, and CWA, which we

address second.  <u>Infra</u> II.

***<u>Analysis</u>***

**I.      NEPA**

<u>A. D&RG Alignment</u>

The Appellants contend that at least three practicable alternatives to the Legacy

Parkway exist including (i) a different highway alignment, (ii) a narrower highway

configuration, and (iii) a mass transit alternative.  They urge that these alternatives are far

less environmentally damaging and would have reduced significantly the wetlands impact

from the project.

We begin with the argument that NEPA was violated by the elimination of the

Denver & Rio Grande ("D&RG") Regional Alignment[3] as an alternative in the FEIS.[4]

The FEIS's chapter on alternatives states that the D&RG Regional Alignment was not

selected for further study because of its high cost and high impact on existing

development relative to the GSL Regional Alignment. I Aplee. App. at 290. The

Appellees assert that, in addition to high cost and high impact, the D&RG was also

eliminated because the railroad right of way was under active consideration for future

light rail and mass transit. Aplee. Br. at 32. Although the FEIS does mention in its

summary of corridor and local planning studies that various organizations have

recommended the preservation of the D&RG right of way for future commuter rail use, I

Aplee. App. at 228-29, the FEIS does not identify this as a reason for eliminating the

D&RG Regional Alignment. We can only affirm agency action, if at all, on grounds

articulated by the agency itself. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560,

1565 (10th Cir. 1994). Therefore, we consider this to be a post-hoc rationalization and do

not consider it.

The Appellants contend that the D&RG Regional Alignment was eliminated in

violation of NEPA because the Agencies failed to verify the cost estimates supplied by

---

[3] The D&RG Regional Alignment was one of two alternatives for the Railroad
Alignment which was one of five regional alignments discussed in the FEIS. I Aplee.
App. at 289 ("There five regional alignments are: . . . • Railroad (either the Denver and
Rio Grande Railroad [D&RGRR] or the Union Pacific Railroad [UPPR]).").

[4] We discuss the DR&G Regional Alignment and the CWA in II.A and conclude
that its elimination did not comport with the CWA on this record.

14

the Applicant UDOT and failed to respond to comments filed by the Appellants raising this issue. See II Aplt. App. 683-84, III Aplt. App. 950 (comments by Sierra and Utahns questioning the cost estimates used to eliminate D&RG and to select GSL). Both NEPA and the COE regulations for implementing NEPA require that the agency verify the accuracy of information supplied by an applicant, 40 C.F.R. § 1506.5(a); 33 C.F.R. Part 325, App. B § 8(f)(2), and respond to substantive issues raised in comments, 40 C.F.R. § 1503.4(a); 33 C.F.R. Part 325, App. B § 13; Van Abbema v. Fornell, 807 F.2d 633, 639-40 (7th Cir. 1986). The record does not reveal, and the Appellees do not assert, that they either verified the cost estimates supplied by the Applicant or responded to the comments submitted by the Appellants on this issue. See IV Aplt. App. at 1243 (letter from COE's Office of Counsel stating that the COE has no records relating to the estimated cost of the D&RG Regional Alignment or the Legacy Parkway Project). The Agencies, therefore, failed to follow their own regulations. Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure. Big Horn Coal Co. v. Temple, 793 F.2d 1165, 1169 (10th Cir. 1986) (citation omitted). No rational explanation has been given.

This is more than a technical requirement when it comes to the cost of the project and alternatives. The FEIS rejected the D&RG Regional Alignment in part on the basis of comparative costs–a $300 million estimate for the Legacy Parkway and a $460 million

15

estimate for the D&RG Regional Alignment.[5] III Aplee. App. 931.2-31.3. Appellants

suggest that shortly after the COE permit decision, the estimated cost for the Legacy

Parkway was $451 million, significantly closer to the initial $460 million estimate for the

DR&G Regional Alignment. They suggest that the COE also relied upon the outdated

cost estimates. Appellees counter that had the D&RG Regional Alignment cost estimate

been updated, there would have been a proportional increase, and thus, the relative cost

relationships would have remained the same. Aplee. Br. at 34-35. This is pure

speculation because there is no cost methodology applicable to the D&RG Regional

Alignment contained in the record. It also demonstrates why the FEIS is inadequate to

meet the NEPA goals of informed decisionmaking and public comment.[6]

_____

[5] This court considers it unlikely, based on the record before us, that a cost estimate for the D&RG Regional Alignment assuming a 100 meter right of way would be appropriate. The FEIS indicates that the cost estimates assumed a 100 meter right of way for all of the alternative regional alignments. I Aplee. App. at 290. As discussed infra at I.B and II.B, the Legacy Parkway's 100 meter right of way includes 13.1 feet for trails, 25.9 feet for a future utility corridor, 33.1 feet for berm, and 65.6 feet for the median. However, the inclusion of the trails within the Legacy right of way was intended to continue the Jordan River trails. I Aplee. App. at 109. The future utility corridor was desirable because of its proximity to existing and future water treatment facilities. I Aplee. App. at 362. Likewise, the width of the vegetated median was described as necessary for water quality, in the absence of a substitute water quality control facility, to reduce the amount of pollutants flowing into the wetlands adjacent to the Legacy Parkway, and to make the construction of unsightly concrete barriers that would have affected the scenic quality of the GSL unnecessary. I Aplee. App. at 110. Given that the reasons for the trails, future utility corridor, and the extra wide median are not relevant to the other alternative alignments, it appears that the cost estimates should have been based on the width of the right of way necessary at that location.

[6] We do not imply that an extraordinarily detailed cost estimate is necessary; however, given the importance of the relative costs to the alternative analyses in the EIS,

The second reason for eliminating the D&RG Regional Alignment given in the FEIS was high impact to existing development. Although there is some support that the D&RG Regional Alignment would have a high impact on existing development, we conclude in II.A that the record is insufficiently developed for purposes of rejecting it as impracticable under the CWA. Thus, we do not decide whether the high impact rationale is adequately explored and sufficiently discussed to comply with NEPA.

B. Narrower Right of Way

The Appellants claim that NEPA was violated by the Agencies' failure to consider a narrower right of way ("ROW") for the Legacy Parkway as a reasonable alternative in the FEIS. While the Legacy's ROW could have been as narrow as 110 feet, I Aplt. App. at 114, the Legacy ROW, at almost 330 feet, will be the widest four lane highway in Utah. Aplt. Br. at 29. The median is to be 65.6 feet wide. The lanes, shoulders, maintenance strips, and fill slopes are collectively to be 176 feet. I Aplee. App. at 112. Additionally, there is to be a berm, utility corridor, and trail system within the ROW. The Appellants adduce that the berm and utility corridor will expand the ROW by 65 to 75 feet, and that the trail system will expand the ROW by about 100 feet. Aplt. Reply Br. at 8 (citing IV Aplt. App. at 1373 (letter dated 1997 from Weber Basin Water Conservation District asking UDOT for 65-75 feet in the Legacy ROW for Beaver Pipeline); IV Aplt. App. at 1315 (article from newspaper saying ROW was being increased by 35 yards to

_____

more than nothing was required.

17

accommodate trails)).[7]  Contrary to the measurements provided by the Appellants in their

Reply, Figure 2-9 of the Legacy Parkway June 2000 FEIS allocates only 13.1 feet for

trails, 25.9 feet for a future utility corridor, and 33.1 feet for the berm.  II Aplt. App. at

625; I Aplee. App. at 507 (trails).

NEPA requires that the Agencies "[r]igorously explore and objectively evaluate all

reasonable alternatives, and for alternatives which were eliminated from detailed study,

briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).

The range of alternatives that the agency must consider is not infinite, of course, but it

does include all reasonable alternatives to the proposed action.  The APA's

reasonableness standard applies both to which alternatives the agency discusses and the

extent to which it discusses them.  City of Grapevine v. Department of Transp., 17 F.3d

1502, 1506 (D.C. Cir. 1994) (citation omitted).

1. Median Width

The Appellants argue that the Applicant chose the wide median so that the Legacy

Parkway could be expanded in the future from four to six lanes, and that the Agencies

have failed to consider whether a narrower median is a reasonable alternative in the FEIS.

While acknowledging that there is "ample space" for two additional lanes within the

current median, I Aplee. App. at 287 (FEIS), the Appellees insist that the 65.6-foot

---

[7] Using the numbers provided by the Appellants, the ROW would total 406.6 feet. This total is clearly higher than the 100-meter (328.1 feet) ROW approved by the COE.  I Aplee. App. at 43 (COE's ROD), 112 (§ 404(b)(1) Evaluation Report), 130 (diagram in COE's Permit).

18

median is necessary for both water quality and safety. Aplee. Br. at 36-37. While the safety justification does not appear to be discussed in the FEIS, the water quality justification is elaborated on as follows:

> The median ... would serve as a vegetated buffer to filter runoff and minimize concentrated discharges. These vegetated medians would have to be maintained to satisfy water quality certification requirements. If replacing these vegetated medians with additional highway lanes is ever proposed, environmental clearances would be necessary and replacement of the water quality functions of the vegetated medians would be required.

I Aplee. App. at 287 (FEIS § 2.2.1). See also I Aplee. App. at 611-12 (FEIS, table 4-40); II Aplee. App. at 811 (FEIS, App. Q). Although none of the cited materials explain exactly how large a vegetated median must be necessary to filter pollutants out of the runoff, the FEIS demonstrates that the Agencies concluded that a narrower median would require a substitute water quality control facility. We hold that the Agencies gave a reasonable explanation for selecting the median width and, therefore, satisfied the requirements of NEPA's 40 C.F.R. § 1502.14(a). As we discuss in II.B, infra, the explanation is insufficient for CWA purposes, given the different standards involved.

2. Trail System

The Appellants allege that the trail system was added to the ROW to gain public support for the Legacy Parkway. Aplt. Br. at 31 (citing to I Aplt. App. at 303 (1997 meeting minutes)). The Appellants have not provided any authority to support the premise that it is a violation of NEPA to consider what will receive public support in designing a project; and, the FEIS discusses the trail system in detail in Chapter 4:

19

Environmental Consequences, I Aplee. App. at 506-10.

### 3. Berm and Future Utility Corridor

The Appellants charge that the berm and the future utility corridor are actually the Beaver River Pipeline in disguise. The Appellees explain that the berm and utility corridor are to serve multiple purposes including protecting the trails and neighborhoods from highway noise and view, and providing a future joint utility corridor. Aplee. Br. at 37; I Aplee. App. at 286, 506-07. Furthermore, the Agencies gave a detailed and reasonable response to comments alleging the intentional concealment of the Beaver River Pipeline's relationship to the Legacy Parkway. IV Aplee. App. at 1323-24. The Agencies have satisfied the requirements of NEPA as to the berm and future utility corridor components of the Legacy ROW.

## C. "Maximum Transit" Alternative

Appellants assert that the Agencies violated NEPA by inadequately evaluating whether mass transit was a reasonable alternative to the Legacy Parkway. Appellants have raised a host of contentions under this issue.

### 1. Failure to Respond to Recommendations and Criticism of an FHWA Headquarter's Expert that No Alternative Analysis had been done on Aggressive Transit

Appellants protest that the FHWA approved the Legacy Parkway without responding to the recommendations and stinging criticism of the transit analysis from a leading expert from headquarters. Aplt. Br. at 34. The Appellants identify this

20

headquarters expert as Dr. Bruce Spear, and point out that the Appellees have cited to nothing in the record indicating that they made any effort to undertake Dr. Spear's recommendations or to explain why they rejected them. The Appellants conclude that "[a] decision is arbitrary and capricious if an agency ignores the uncontradicted advice of any expert, let alone its own." Aplt. Reply Br. at 14 (citing North Spotted Owl v. Hodel, 716 F. Supp. 479, 483 (W.D. Wash. 1988)). To support their argument, the Appellants cite to a five-page document entitled "Comments on the Sierra Club Critique of the Travel Demand Models for the Legacy Parkway FEIS and WFRC Response." III Aplt. App. at 1137-41. No date or name appears on the document.[8] The Appellants also cite to Dr. Spear's curriculum vitae which appears at IV Aplt. App. at 1249. While this does establish that Dr. Spear works for the United States Department of Transportation, it does not establish a date or author for the five-page "Comments" document. Consequently, the Appellants have established only that the author of the "Comments" document had a difference of opinion on whether aggressive transit had been adequately considered as a reasonable alternative. The author's opinion was clearly not "uncontradicted." I Aplee. App. at 267-80. Even assuming that the author of the "Comments" document was an expert, it is well established that agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious. Custer County, 256 F.3d at 1036. Therefore, the Appellants have failed to establish a violation of NEPA as to this

---

[8] The Appellees only refer to the author of the "Comments" document as "FHWA commentator." Aplee. Br. at 24 n.8.

document.

2. Unexplained Failure of Agencies to Perform a More Complete Alternative Transit Analysis

Appellants assert that the Agencies violated NEPA by not requiring the more complete alternative transit analysis recommended by the Applicant's contractor. Aplt. Br. at 34-35. NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). However, there is nothing in NEPA to suggest that the transit alternative could not be rigorously explored and objectively evaluated absent the alternative transit analysis recommended by an Applicant's contractor. The FEIS contains four independent methods of analysis to determine what contribution transit could make in serving transportation demand. I Aplee. App. at 275-79. The Appellants have failed to establish that the Agencies acted improperly in not performing the analysis recommended by the contractor.

3. Use of Erroneous Ridership Projections

The Appellants next take issue with the light rail ridership estimates. The Agencies assumed only 14,000 daily riders by the year 2010. Yet actual daily ridership of UTA's new commercial light rail system has been approximately 19,000 since operations commenced in December 2000. The Appellees rebut that while daily ridership has been higher than predicted, the peak-hour ridership has been nearly equal to predictions. I Aplee. App. at 278. The FEIS ridership projections are for peak-hour ridership, not daily ridership. This argument is without merit.

22

4. Use of Outdated Survey Results

The Appellants attest that the Agencies relied on outdated and questionable "household survey" results to determine the public's interest in using mass transit. As support, the Appellants cite to a document prepared for the Sierra Club by a Ph.D. student and a professor at the University of California, Davis, in September of 1998, reviewing the WFRC's Travel Forecasting Model, I Aplt. App. at 398, and what appears to be a flyer for Envision Utah, III Aplt. App. at 985. Due to the poor quality of the copy, the court was unable to read a large portion of the flyer. However, Appellants tell us that it states that a recent survey indicated that 86 percent of residents favor the expansion of transit. Aplt. Br. at 35.

The Appellees point out that the Travel Demand Model Peer Review found the household survey to be adequate. III Aplee. App. at 1054. The Agencies are entitled to rely on their own experts. Custer County, 256 F.3d at 1036. Additionally, the surveys with which the Appellants take issue were only used in two of four independent methods of projecting transit demand. I Aplee. App. at 275-77 (FEIS). The FEIS relied on the higher projection that was generated by the Financial Constraint Method which did not take into consideration the household survey. I Aplee. App. at 277, 279. We conclude that the attack on the home surveys is unavailing.

5. Failure to Consider both Commuter Rail and Light Rail

Appellants' entire argument on this issue consists only of the statement that "[t]he

23

EIS transit analysis underestimated the potential for mass transit to meet future travel demand by failing to consider implementation of both community light rail and regional commuter rail." Aplt. Br. at 35. The Appellants cite only to a document entitled "Inter-Regional Corridor Alternative Analysis: Preliminary Alternative Screening," which is dated March 1, 2001, and consists of two maps. I Aplt. App. at 205-07. The Appellants fail to explain how maps from March 2001, establish that the Agencies were arbitrary and capricious in not including both community light rail and regional commuter rail as a reasonable alternative in the June 2000 FEIS. We, therefore, deem this argument waived for failure to brief. Phillips v. Calhoun, 956 F.2d 949, 954 (10th Cir. 1992).

6. Failure to Consider Alternative Sequencing of the "Shared Solution"

The Appellants claim that an alternative sequencing of the "Shared Solution," such that public transit is expanded before the Legacy Parkway is built, is a reasonable alternative and the FEIS is inadequate under NEPA because it failed to explore rigorously and evaluate objectively this alternative. The Shared Solution includes: (1) improving and expanding I-15, (2) an extraordinary expansion of the public transit system, and (3) constructing the Legacy Parkway. I Aplee. App. at 285. Appendix G of the FEIS contains a detailed discussion of why the Legacy Parkway should be built before I-15 is improved and expanded. II Aplee. App. at 729-47. However, no mention is made in Appendix G as to when the "extraordinary expansion of the public transit system" should occur relative to the Legacy and I-15 projects. The Appellants have provided expert

24

opinion and comments submitted to the Agencies on the importance of expanding public transit prior to constructing new roads. III Aplt. App. at 924, 914-15, 917, 895-96, 933, 1128.

The Appellees respond that the implementation of rail transit is five to fifteen years behind the Legacy Parkway, IV Aplee. App. 1315, and argue that Utah has not begun to meet the requirements for federal rail funding. Aplee. Br. at 23. They conclude that "[r]egional transit choices that may be made in the future are not reasonable alternatives to off-set [sic] the need for new roadway construction now." Aplee. Br. at 23.

There are three problems with Appellees' response. First, the expansion of public transit under consideration is broader than just rail transit. Second, the regional transit choices that are at issue here are not ones "that may be made in the future," but are being made. The FEIS is relying on public transit to meet 12 percent of the 2020 demand and maybe the additional 10 percent of demand that will not be met under the Shared Solution. A WFRC study on the best modes of mass transit was expected to be completed in 2001. IV Aplee. App. at 1315. There is no question as to whether a regional transit choice will be made. Third, while the project may address a "need for new road construction now," the decided focus of the FEIS and its evaluation of alternatives "is to provide a solution to meet the 2020 transportation needs of the North Corridor." Aplee. App. 261. The estimated time to construct the Legacy Parkway and reconstruct I-15 is

25

seven years. II Aplee. App. at 730. Delaying the Legacy Parkway and I-15 project until after all or part of the public transit expansion is in place is an alternative that could be reasonable and one the Agencies did not include in the FEIS, thus rendering it inadequate.

Appellees rely upon North Buckhead Civic Ass'n v. Skinner, 903 F.3d 1533, 1541-43 (11th Cir. 1990), holding that while an agency must consider realistic possibilities, it need not consider unreasonable, speculative possibilities. In that case, however, the panel held that a detailed discussion of a contended-for alternative (heavy rail transit) was unnecessary because nothing suggested it would have a less severe environmental impact, and it would not solve the problem at hand – surface street congestion. Id. at 1543. Here, the Agencies were not faced with an unreasonable or speculative alternative; indeed, the Agencies relied upon public transit to meet part of the demand in 2020, and simply did not take a hard look at whether public transit could alleviate the immediacy of the need for the I-15 expansion or Legacy Parkway construction.

7. Failure to Consider Integration of the Legacy Parkway and Transit

In an argument closely related to an alternative sequencing, the Appellants assert that NEPA was violated by a failure to consider integrating the construction of the Legacy Parkway with the expansion of public transit as a reasonable alternative. As discussed in I.C.6, no mention is made in Appendix G of when public transit should be expanded relative to the Legacy Project. Appellants have cited comments by the FTA and

comments submitted to the Agencies discussing the significant savings to be gained by building the Legacy Parkway and expanding public transit simultaneously. I Aplt. App. at 227. Appellees' only response is to cite to comments in the COE's ROD, COE, and FHWA comments made after the FEIS, and a January 2001 letter from the COE to the EPA. Aplee. Br. at 28 (citing I Aplee. App. at 61; IV Aplee. App. at 1315, 1428). All of these came after the June 2000 FEIS; none of them demonstrate that integration was considered; and none of them explain why integrating the Legacy Parkway with the expansion of public transit is not a reasonable alternative. We, therefore, conclude that omitting integration as a reasonable alternative in the FEIS renders it inadequate.

8. Failure to Consider Expanding I-15 and Transit First

Appellants argue that the Agencies failed to consider whether I-15 could be expanded without the Legacy Parkway. Appendix G of the FEIS contains a detailed discussion of options for the construction sequence. II Aplee. App. at 729-47. The FEIS concludes that it would be safer, cheaper, and better for the environment to construct the Legacy Parkway prior to expanding I-15. II Aplee. App. at 736. Although "[d]ocumentation in the administrative record indicates that I-15 could be expanded without the Legacy Parkway," Aplt. Br. at 36, it also demonstrates the reasonableness of the Agencies' conclusion that it would be better to build the Legacy Parkway before reconstructing I-15. II Aplee. App. at 729-47. As we have noted before, it is well established that agencies are entitled to rely on their own experts so long as their

27

decisions are not arbitrary and capricious. Custer County, 256 F.3d at 1036.

9. Failure to Give Basis for Financial Constraints Estimates on Transit Expansion

Appellants suggest that NEPA was violated because the FEIS limited the amount of transit capacity that could be developed based on assumptions of the likely future financial resources of the Utah Transit Authority ("UTA") without setting forth those assumptions in either the FEIS or the record. Aplt. Br. at 37-38. As discussed at I.A., NEPA regulations require the agency to verify the accuracy of information supplied by an applicant. 40 C.F.R. § 1506.5(a). However, UDOT, not UTA, is the Applicant in this case. Additionally, the FEIS states and the record supports that the information used in the FEIS for projecting UTA's future financial resources was developed by the Agencies "in consultation with the UTA," not merely supplied by the UTA without verification by the Agencies. I Aplee. App. at 277. See also III Aplee. App. at 931 (statement made in 1998 by representative of UTA that UTA has reached the limit of its resources), 1110 (letter written in February 2000 from UTA to UDOT stating that it is confident it can meet the 10 percent of 2020 demand allocated to it "if sufficient resources can be found"); II Aplee. App. at 750 (document apparently included in the appendix to the FEIS which gives estimates of the cost and capacity of different forms of transit and citing to the Long Range Transit Analysis done by WFRC); I Aplee. App. at 268 (Table 2-1of FEIS giving estimates of cost per mile for rail transit based on the North Front Range Transportation Alternative Feasibility Study of 1999). The fact that Appellants disagree

28

with the financial projections that UTA and the Agencies made does not by itself make those projections inadequate.

The Appellants also charge that "[t]he Federal Agencies failed to anticipate the hundreds of millions of dollars of additional revenue from the sales tax for transit projects passed by referendum in November 2000." Aplt. Br. at 38 n.13. However, Appellants have failed to explain how a FEIS from June 2000 violated NEPA by not anticipating a sales tax that was passed in November 2000, especially when voters had previously rejected a tax increase to support transit. III Aplt. App. at 1019.

D. Reducing Travel Demand and Alternative Land Use Scenario Alternative

The Appellants contend that NEPA was violated by the FEIS's failure to consider reducing travel demand through alternative land use scenarios in combination with mass transit as a reasonable alternative. Aplt. Br. at 40. As has been stated before, NEPA requires the rigorous exploration and objective evaluation of reasonable alternatives. 40 C.F.R. § 1502.14(a). The Agencies argue that reducing travel demand through alternative land use scenarios alone or in combination with mass transit was not a reasonable alternative. To be a reasonable alternative, it must be non-speculative, Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999); North Buckhead, 903 F.2d at 1541, and bounded by some notion of feasibility. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 551 (1978). In finding that a FEIS adequately considered energy conservation as an alternative, the Supreme Court noted

29

that

> There is reason for concluding that NEPA was not meant to require
> detailed discussion of the environmental effects of "alternatives" put
> forward in comments when these effects cannot be readily ascertained
> and the alternatives are deemed only remote and speculative possibilities,
> in view of basic changes required in statutes and policies of other agencies
> – making them available, if at all, only after protracted debate and litigation
> not meaningfully compatible with the time-frame of the needs to which the
> underlying proposal is addressed.

Vermont Yankee, 435 U.S. at 551 (quoting Natural Res. Def. Council v. Morton, 458

F.2d 827, 837-38 (D.C. Cir. 1972)).

Land use is a local and regional matter. The North Corridor includes all or parts of

SLC, Salt Lake County, North Salt Lake, Woods Cross, Bountiful, West Bountiful,

Centerville, Farmington, Kaysville, and Davis County. I Aplee. App. at 221-22. There

are, therefore, a number of local and regional governmental entities whose cooperation

would be necessary to make an alternative land use scenario a reality. The Appellees

replied to comments made after the FEIS that "[t]o date, [the state, regional and local

entities with responsibility for land use planning] have resoundingly declined to alter their

plans based upon such comments." Aplee. Br. at 31 (citing IV Aplee. App. at 1335). We,

therefore, conclude that the Agencies' treatment of the alternative land use was adequate.

E. Cumulative Effects of Six Lanes

The Appellants allege that NEPA was violated by the FEIS's failure to consider

the cumulative impact of a future expansion of the Legacy Parkway from four lanes to

six. "An environmental impact statement must analyze not only the direct impacts of a

30

proposed action, but also the indirect and cumulative impacts." Custer County, 256 F.3d

at 1035 (internal quotation omitted). See also 40 C.F.R. § 1508.25(a)(2) (scope of EIS is

influenced by cumulative actions and impact). Cumulative impact is defined as:

> the impact on the environment which results from the incremental impact
> of the action when added to other past, present, and reasonably foreseeable
> future actions regardless of what agency (Federal or non-Federal) or person
> undertakes such other actions. Cumulative impacts can result from
> individually minor but collectively significant actions taking place over a
> period of time.

40 C.F.R. § 1508.7.

The Tenth Circuit has "expressed the test for whether particular actions could be

considered cumulative impacts of the proposed action as whether the actions were so

interdependent that it would be unwise or irrational to complete one without the others."

Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 430 (10th Cir. 1996)

(internal quotation omitted). In Airport Neighbors, the City of Albuquerque had a master

plan for the city's airport which set forth a construction schedule in three phases over 20

years. The plan included upgrading one runway to accommodate commercial jet traffic,

reconstructing another runway, expanding the terminal facility, constructing a second

parking structure, building a new cargo services building, expanding surface access roads,

and relocating rental car facilities. Id. at 428. The appellants challenged an

environmental assessment covering only the runway upgrade as being inadequate under

NEPA because it failed to consider the cumulative impacts of the other components of the

plan. The appellees responded that the runway upgrade was independent from the plan

31

and that the other components of the plan were merely elements that might be complemented over a twenty-year period. Id. The court found that the record suggested that the city would upgrade the runway even if the other components of the master plan were not implemented. Id. at 431. The court concluded that the components of the plan were not so interdependent that it would be unwise or irrational to complete the runway upgrade without them. Id. According to the court, requiring a cumulative EIS to analyze possible future actions in a twenty-year master plan would result in a misallocation of resources, and would undercut NEPA's objective of useful environmental analysis regarding major federal actions. Id.

In this case, the Appellants assert that it is reasonably foreseeable that the Legacy Parkway will be expanded to six lanes because of the "Note" in the Evaluation Report that the wide median is necessary for the possible addition of two lanes, I Aplee. App. at 111, the fact that the FEIS points out that there is ample room in the median for two additional lanes, I Aplee. App. at 287, the suggestion that the Legacy Parkway be expanded to six lanes by 2015 in the WTC MIS, Aplt. App. at 880, and the fact that the Shared Solutions Plan will only meet 90 percent of the demand projected for the year 2020, I Aplee. App. at 623. The Agencies argue that they reasonably concluded that the FEIS did not need to consider the potential impacts of an expansion to six lanes because the Legacy Parkway has been defined as a four-lane highway in the FEIS, I Aplee. App. at 167, the FHWA's ROD, I Aplee. App. at 2, the COE's ROD, I Aplee. App. at 39, the §

32

404(b)(1) Evaluation Report, I Aplee. App. at 111, and the COE's Permit, I Aplee. App. at 124. The only place that six lanes were proposed was in the Western Transportation Corridor ("WTC") MIS. Additionally, the record shows that the Agencies considered whether the cumulative impacts of adding two lanes needed to be included in the FEIS and determined that it did not. IV Aplee. App. at 1191, 1253.

Under the arbitrary and capricious standard of review, this court must give the Agencies' decision substantial deference. After an examination of the authority cited by the parties, we conclude that the Legacy Parkway as currently planned and the possible addition of two lanes are not so interdependent that it would be unwise or irrational to complete one without the other. Airport Neighbors, 90 F.3d at 430. Therefore, it was unnecessary to include the cumulative impact of any potential expansion to six lanes in the EIS.

F. Failure to Consider Land Use Impacts

An EIS must analyze not only the direct impacts of a proposed action, but also the indirect impacts of past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. See Custer County, 256 F.3d at 1035. Indirect impacts are defined by the NEPA regulations as being "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. ... [They] may include growth inducing effects ...." 40 C.F.R. § 1508.8(b). Appellants consider the FEIS to be inadequate under NEPA because it does not consider

the land use impacts that the Legacy Parkway will have on the North Corridor. Aplt. Br. at 47. "In reviewing the adequacy of a final environmental impact statement we merely examine whether there is a reasonable, good faith, objective presentation of the topics [NEPA] requires an [EIS] to cover." Colorado Envtl. Coalition, 185 F.3d at 1172 (internal quotations omitted).

The FEIS states that:

> Consultations with local planners indicate that ultimate growth patterns and planned land uses would not change as a result of building the Legacy Parkway. However, the type of development that would occur around the area of the Legacy Parkway interchanges (at 500 South and at Parrish Lane) would likely be different than the type of development that would occur without the Parkway. ... [T]herefore, the development would occur sooner with the Parkway than without it."

I Aplee. App. at 443. See also I Aplee. App. at 451-52. The Appellants argue that the FEIS's conclusion that there would be no land use impacts attributable to the Legacy Parkway is circular and illogical "because municipal planners had already modified their land use plans to accommodate the sprawl development that will be caused by construction of the Legacy Parkway." Aplt. Br. at 47-48. The Legacy Parkway has been under consideration in some form or another since 1996 and most if not all of the local governments in the North Corridor have revised their land use plans in the intervening six years.

We reject Appellants' challenge. First, there is some authority for allowing agencies to rely on local planning documents in an EIS to establish that a proposed

34

highway will not result in further growth.  Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.2d 517, 524 n.6 (9th Cir. 1994).  Such reliance may readily show that land use impacts may be nil because the surrounding land at issue is already developed or is otherwise committed to uses that were not contingent on the project under consideration.  City of Carmel-by-the-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1162 (9th Cir. 1997).  Second, the FEIS states that the Agencies consulted with local planners, not local plans.  Appellees' citations to local plans that reflect the Legacy Parkway does not prove that the local planners were not able to advise the Agencies of what land use would occur without the Legacy Parkway.

Appellants additionally note that the FEIS's finding of no land use impacts was criticized by other agencies.  However, NEPA requires agencies preparing an EIS to consider and respond to the comments of other agencies, not to agree with them.  Custer County, 256 F.3d at 1038 (citing 40 C.F.R. § 1503.4).  The record indicates that the Agencies considered and responded to the comments of other agencies.  Many of the criticisms cited by the Appellants in their brief were made early in the NEPA process and do not reflect the agencies' final positions on this issue.  IV Aplee. App. at 1255.  The FEIS's conclusion that the Legacy Parkway would not impact land use does not render the EIS inadequate.

G. Failure to Consider Impacts to SLC

Appellants assert that the FEIS is inadequate under NEPA because it did not

35

consider the impact construction of the Legacy Parkway will have on SLC. Appellants'

brief contains a list of twelve alleged impacts to SLC that the FEIS failed to consider.

Aplt. Br. at 55. As noted above, issues will be deemed waived if they are not adequately

briefed. Phillips, 956 F.2d at 954. We do not consider merely including an issue within a

list to be adequate briefing. Therefore, we will consider only those impacts Appellants

briefed which include (1) the FEIS's failure to consider whether the proposed Legacy

Parkway is consistent with the SLC Transportation Master Plan, (2) the FEIS's failure to

analyze the impact increased auto congestion will have on SLC, and (3) the FEIS's failure

to consider the social and economic impacts that increased congestion will have on SLC.

The Agencies responded on at least one occasion to comments expressing concern

about impacts on SLC from the construction of the Legacy Parkway by stating that the

purpose of the Legacy Parkway was not to bring more cars to SLC. IV Aplee. App. at

1314.1. As the Appellants point out in their brief, purpose and intent respecting a

project's impacts are irrelevant. Agencies must evaluate all reasonably foreseeable

project impacts regardless of whether they are intentional. Aplt. Br. at 57. See also 40

C.F.R. §§ 1502.16(b), 1508.8(b).

1. Consistency with the SLC Transportation Master Plan

NEPA regulations require that:

To better integrate environmental impact statements into State or local
planning processes, statements shall discuss any inconsistency of a
proposed action with any approved State or local plan and laws . . .
[w]here an inconsistency exists, the statement should describe the extent

36

to which the agency would reconcile its proposed action with the plan or law.

40 C.F.R. § 1506.2(d). The Appellants charge that the Agencies did not discuss the inconsistency between the SLC Transportation Master Plan and the Legacy Parkway and did not describe the extent to which the Agencies would reconcile the proposed action with the plan. See III Aplt. App. 829. The Appellants based their assertion of inconsistency on the fact that the SLC Transportation Master Plan indicated that the City had shifted priorities to mass transit and multiple forms of transportation and away from increasing road capacity and meeting the needs of the single-occupant automobile. Aplt. Br. at 56.

The Agencies reviewed and the FEIS describes eight different SLC transportation plans, including the SLC Transportation Master Plan of 1996. I Aplee. App. at 229; see also I Aplee. App. 451. Many of these plans anticipate an increase in travel demand in SLC, and some specifically recommend construction of a new north-south highway. Aplee. App. at 231. Furthermore, a map from the SLC Transportation Master Plan of 1996 shows a proposed West Davis Highway running north from SLC and located west of I-15. IV Aplee. App. at 1555. The Appellants have not cited any place in the SLC Transportation Master Plan where all new road construction was opposed. Shifting priorities and opposing any and all new construction are different things. Therefore, the EIS is not inadequate on this basis. We find that the FEIS's apparent conclusion that the Legacy Parkway project was not inconsistent with SLC's plans does not render the FEIS

37

inadequate.

2. Impact Increased Auto Congestion will have on SLC

Appellants assert that the FEIS failed to discuss the impact increased auto congestion caused by construction of the Legacy Parkway will have on parking, arterial and side streets, and pedestrian and bicycle safety in SLC. The Agencies only have a duty to discuss in the FEIS impacts that are reasonably foreseeable. Even as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and merit inclusion, the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project. Sierra Club v. Marsh, 976 F.2d 763, 767 (1st Cir. 1992). See also Izaak Walton League of Am. v. Marsh, 655 F.2d 346, 377 (D.C. Cir. 1981) ("NEPA does not require federal agencies to examine every possible environmental consequence. Detailed analysis is required only where impacts are likely.").

Both the Agencies' comments and the FEIS note that with or without the Legacy Parkway there will be a substantial increase in travel demand in SLC by 2020. The FEIS calculated the percentage of the total demand in 2020 that will be caused by the construction of the Legacy Parkway at 3.3 percent or less. I Aplee. App. at 258-59. The 3.3 percent estimate includes all traffic in both directions. When adjusted for the directional split, the fact is that while a portion of the traffic is headed in the peak direction, the other portion is traveling in the off-peak direction, and only 1.98 percent of

38

the travel demand going to SLC in 2020 will be caused by the construction of the Legacy Parkway. While the Appellants still consider this to be a significant amount, the Agencies reasonably concluded that this amount was too small for its inclusion in the FEIS to be reasonably necessary under the circumstances for evaluation of the project. Sierra Club, 976 F.2d at 767.

3. Social and Economic Impacts that Increased Congestion will have on SLC.

As discussed above, the Agencies reasonably concluded that construction of the Legacy Parkway would not increase congestion in SLC sufficiently to merit inclusions in the FEIS. Therefore, the failure to consider the social and economic impacts of this insignificant increase does not render the EIS inadequate.

H. Failure to Consider Growth and Land Use Impacts on Areas North of the Legacy Parkway

Appellants take issue with the FEIS's failure to consider the growth and land use impacts construction of the Legacy Parkway will have on the areas north of the project area. To show that this omission was unreasonable and in violation of NEPA, they quote from an undated, untitled, anonymous document which states "It is more likely that the [Legacy Parkway and I-15] projects will influence growth and property build-out in areas further north of the projects [than in the project corridor]." III Aplt. App. at 1118. In contrast, the FEIS states that "it is expected that growth patterns and planned land use north of the Legacy Parkway would not change as a result of building the Legacy Parkway." I Aplee. App. at 443. Additionally, the Appellants note that, according to the

39

minutes of the April 26, 2000 Federal Agency Meeting to Review FEIS Comments, while discussing Issue 12: land use discussion between the build and no-build scenarios, the EPA expressed more concern about growth and land use impacts caused by the construction on the area north of the project than on the project area. III Aplt. App. at 1048.

First, Appellants' document shows only that at some unknown point in the process an unknown participant felt that the Legacy and I-15 projects were more likely to cause growth and land use impacts north of the project area than within the project area. Differences of opinion during the process between some participants does not by itself make the final conclusion of the Agencies unreasonable. Second, the NEPA requires Agencies to consider and respond to the comments of other agencies, not agree with them. Custer County, 256 F.3d at 1038 (citing 40 C.F.R. § 1503.4). The Appellees counter that at an April 27, 2000 meeting, while discussing Issue 12: discussion of land use impacts between the no-build and build scenarios, the timing of development for lands north of the study area was discussed and revisions to the FEIS were made. IV Aplee. App. at 1194, 1205. Additionally, at a June 8, 2000 meeting which the EPA attended, Issue 12 was again discussed and the issue was resolved. IV Aplee. App. at 1255. The FEIS is not inadequate on this basis.

I. Impacts to Wetlands

An EIS must analyze the indirect impacts of a proposed action. Custer County,

256 F.3d at 1035. Indirect impacts are defined as being caused by the action and are later in time or farther removed in distance but still reasonably foreseeable. 40 C.F.R. § 1508.8(b). The Appellants allege that the Agencies violated NEPA by their inadequate analysis of impacts on wetlands. After reviewing the FEIS, especially chapters three and four, we find that the indirect impact on wetlands analysis is not inadequate to the point of being arbitrary and capricious. I Aplee. App. at 325-441; 442-617.

The Appellants also contend that NEPA was violated because the Agencies: (1) failed to classify the wetlands into subcategories, (2) failed to take actual field data, (3) assumed that land use changes within 1000 feet of a wetland perimeter adequately predicted the wetlands' level of functionality, and (4) used the Everglades HGM Regional Guidebook.

1. Failed to classify wetlands into subcategories as required by HGM protocols

The Appellants argue that the Appellees acted arbitrarily and capriciously by violating the hydrogeomorphic methodology ("HGM") protocols by only classifying the wetlands into the general categories of groundwater slope, basin depressional, and lacustrine fringe without providing an explanation in the record. Aplt. Br. at 64 (citing 62 Fed. Reg. 33,609-10 ("NAP")). The Appellees assert that the Legacy HGM was merely guided rather than limited by the NAP and point out that early analyses that included subclassifications did not increase the accuracy of the model over the use of the basic classifications. The Appellants' contention that the subcategories were omitted without

explanation in the record is simply inaccurate.  The FEIS states that:

> Initially, the wetlands were characterized by HGM category and then each category was subdivided into subclasses, based upon the primary wetland vegetative community.  These subclasses were used in the development of various HGM models.  Many of these vegetative communities were mapped separately, but are part of a larger depression or basin.  After the HGM model was initially developed, it was found that using these subclasses of smaller vegetative communities produced results that do not accurately reflect the way these wetlands are performing their functions.  Consequently, subdivision into vegetative subclasses was eliminated and the wetlands functional models are now based on the more general HGM categories (lacustrine fringe, groundwater slope and basin depressional wetlands).

I Aplee. App. at 390-91.  It is arbitrary and capricious to not follow a protocol without giving a rational explanation.  Big Horn Coal Co., 793 F.2d at 1169 (citations omitted) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures.").  See also Midwestern Transp., Inc. v. Interstate Commerce Comm'n, 635 F.2d 771, 777 (10th Cir. 1980) ("[T]he court must require the agency to adhere to its own pronouncements or explain its departure from them; ... .");  Squaw Transit Co. v. United States, 574 F.2d 492, 496 (10th Cir. 1978) (same).  Here, however, even accepting the contention that protocols were not followed, a rational explanation was given.  I Aplee. App. at 390.

The Appellants respond in their reply brief that "[i]f Agencies' initial subclassification was inadequate, the appropriate response was to improve, not abandon the necessary work."  Aplt. Reply Br. at 25.  It is well established that agencies are entitled to rely on their own experts so long as their decision is not arbitrary and

capricious. Custer County, 256 F.3d at 1036. The fact that the Appellants consider the experts' decision to be an inappropriate response does not render the FEIS inadequate.

2. Failed to take actual field data for developing the functional profile.

The Appellants contend that NEPA was violated by the Agencies' failure to develop functional profiles for each wetlands subclass within the affected region and to identify and collect field data on measurable ecological attributes. Aplt. Br. at 65. As discussed immediately above, the Agencies gave a rational explanation for not classifying the wetlands into subcategories. It would not be rational to require the Agencies to develop functional profiles for each subclass when they were not required to identify subclasses. See supra I.I.1. The Appellants' claim that the Agencies failed to identify and collect field data on measurable ecological attributes is contradicted by the record. IV Aplee. App. at 1378, 1379, 1380, 1557; III Aplee. App. at 1122.4. Additionally, we find it significant that the NAP states, "The functional profile is based on the experience and expertise of the A-team [assessment team] and information collected from reference wetlands." 62 Fed. Reg. 33,607, 33,610 (June 20, 1997).

3. Assumed land use changes within 1000 feet predicted the wetlands' level of functionality.

The Appellants allege that the Agencies violated the HGM protocols by treating all three types of wetlands as having the same functions and associated indicators based on the assumption that land use changes within 1000 feet of the wetlands' perimeter adequately explains variations in the wetlands' function. Aplt. Br. at 66. Appellants cite

43

to a 1993 Wetlands Research Program Technical Report that states, "Each population of wetland types or classes would be identified with a unique list of functions and associated indicators. (If the list is not unique in some way for the wetland type, then it is probably not adequate for assessment. In other words, the classification was not specific enough and the functional profile was not adequately prepared.)" I Aplt. App. at 82 (Mark Brinson, "A Hydrogeomorphic Classification for Wetlands").

The NAP instructs that "[t]he functional profile is based on the experience and expertise of the A-team and information collected from reference wetlands." 62 Fed. Reg. at 33,610. Based on their experience and expertise, the A-team concluded that the amount and degree of anthropogenic influences either within or surrounding a wetland serve as an indicator of the level of wetland functionality. This assumption was based on several regional guidebooks developed in Florida and research completed in Canada. III Aplee. App. at 1122.2. Additionally, information was collected from reference wetlands that verified the model. IV Aplee. App. at 1379, 1380. Consequently, this court is unable to say that this decision of the Agencies' experts renders the EIS inadequate. See Custer County, 256 F.3d at 1036.

4. Use of the Everglades HGM Regional Guidebook

The Appellants contend that use of the Everglades HGM Regional Guidebook by the A-team conducting the Legacy HGM was arbitrary and capricious because the Guidebook "state[s] that it is a guidebook designed to apply to only certain types of

44

depressional wetlands in Florida, that using the guidebook for other types of wetlands even in Florida was inappropriate, and that other guidebooks will be developed for assessing the functions of other types of Florida depressional wetlands." Aplt. Br. at 68 (citing to II Aplt. App. 698A which is from a 1997 Field Test Draft of the Everglades HGM Regional Guidebook). However, no such statement appears on the page cited by Appellants. Additionally, the record shows that the A-team considered other documents before deciding to use the Everglades HGM Regional Guidebook. III Aplee. App. at 1122.2-22.3.

J. Failure to Consider Impacts to Wildlife

The Appellants charge that the FEIS is inadequate and violates NEPA regulations because: (1) only wildlife impacts within 1000 feet of the ROW were considered, (2) the FEIS contains inadequate wildlife impact analysis; (3) the Agencies failed to adequately consider noise impacts on wildlife; and (4) wildlife impact and success of mitigation were not considered in light of the dynamic cycle of the GSL. Because we find that the wildlife impact analysis is inadequate under NEPA because the 1000-foot radius excluded consideration of impacts on migratory birds, it is not necessary to reach (2)-(4).

1. Only considered impacts to wildlife within 1000 feet of project

Appellants contend that the FEIS violated NEPA by only considering impacts on wildlife habitat within an arbitrary 1000-foot distance from the right of way. I Aplee. App. 558, 565. This was done even though the FWS presented evidence to the Federal

45

Agencies that roads can cause significant adverse effects to bird populations as far as 1.24 miles from roadways, especially in open terrain like that adjacent to the proposed Legacy Parkway. Aplt. Br. at 69.

In response to a comment that was submitted alleging that the 1000-foot distance was chosen arbitrarily, the Federal Agencies made the following response:

> The HGM model used 1000 feet because the data we collected for land use (which extended to 1 mile from the edge of the wetland) did not result in any statistical difference from the data collected at 1000 feet.

Aplee. App. at 1322 (Response to Comments, October 26, 2000). However, by only evaluating impacts to habitat structure within 1000 feet of the roadway, the Applicant and Agencies effectively limited any assessment of wildlife use and value to smaller, less mobile species and ignored the primary concern of many public and private entities: impacts to the GSL ecosystem and its ability to continue as a nationally and internationally significant wildlife use area, particularly for migratory birds. I Aplt. App. at 355 (April 2000 letter from FWS to UDOT). The record repeatedly and without contradiction indicates that the 1000-foot limit used in the FEIS does not allow for consideration of impacts on migratory birds. I Aplee. App. at 401 (FEIS) (noting that because birds have a migratory range up to miles they are beyond the scope of the assessment model); IV Aplee. App. at 1267 (July 2000 Wetland QC Report Legacy Parkway) (same); I Aplt. App. at 223 (December 1999 Meeting Minutes) ("UDWR and FWS comment that the barrier variable does not take into account the impact to avian

46

species.  Response: That information cannot be included in the HGM model, it's too specific.  It will have to be assessed elsewhere."); Aplt. App. at 339 (June 2000 letter from FWS to FHWA) ("[T]he extent of many potential impacts to wildlife had not been quantified by HGM or any other approach.").  While we recognize that the failure "to employ a particular method of analysis" in an EIS does not render it inadequate, Utah Shared Access Alliance, 288 F.3d at 1212, here the FEIS simply is inadequate to address the impact on migratory birds.

The Appellees respond that they fully explained the rationale for their decision to study indirect wildlife impacts in a 1000-foot zone on each side of the Parkway right-of-way, Aplee. Br. at 58.  However, their only citation in support of this statement is a response to a comment from October 2000 that does not address their own admission that birds were beyond the scope of the HGM.  IV Aplee. App. at 1322; I Aplee. App. at 401.  Further, this response regarding statistical differences in "land use" is so unclear as to make us question whether it even relates to the effects on wildlife.  The Appellees also reply that 317 acres of land preservation were added to the mitigation package because of the criticisms.  Aplee. Br. at 57.  Increasing the mitigation package, however, does not resolve the inadequacy of the FEIS's wildlife impact analysis.  Given that some two to five million birds use the GSL each year, a large portion of which are migratory birds, we find that limiting the wildlife impact analysis so that migratory birds are beyond its scope

renders the FEIS inadequate.[9]


K. Air Quality Impacts

In response to comments on the DEIS, the FEIS increased by two million its estimate of Vehicle Miles Traveled ("VMT") per day in 2020 under both the no-build and build scenarios. Compare II Aplt. App. at 529 (DEIS estimating VMT in 2020 at 46 million), with II Aplt. App. at 775 (FEIS estimating VMT in 2020 at 48 million). Additionally, the FEIS attributed 3.3 percent of the total project demand for 2020 to latent demand. II Aplt. App. at 562. Appellants assert that the FEIS is inadequate because the air pollution analysis was not adjusted to reflect the increase in VMT or the latent demand. Aplt. Br. at 76.

The FEIS did not recalculate the impact on air pollution, compare III Aplt. App. at

---

[9] The Appellants would have this court order the Agencies to complete a habitat evaluation procedure ("HEP") analysis as recommended by DWR and FWS. Aplt. Br. at 71; II Aplt. App. at 809 (DWR); I Aplt. App. at 222-24 (DWR and FWS). In response, Appellees cite to an undated, unsigned document entitled "Comments on DWR review of the EIS for Legacy Highway" which states in relevant part:

> Additional documentation was provided in the QC for Legacy. Larry
> Dalton told us early in the process of developing the model that HEP
> would not be required. We could go on and on about the inadequacies
> of HEP.

IV Aplee. App. at 1558. This document is of little help to the court. However, it is within the Agencies' discretion to select a method of wildlife impact analysis so long as it is not arbitrary and capricious. Therefore, we decline to restrict that discretion by mandating an HEP analysis.

526, <u>with</u> III Aplt. App. at 603. This was because of the addition of a fourth county to the revised model, was explained in the FEIS, and does not make the FEIS inadequate. III Aplt. App. at 603. As explained in the FEIS, latent demand is the portion of total demand that is influenced by the presence of impediments to travel. III Aplt. App. at 559. It does not represent an increase in total demand. Therefore, not adjusting the air pollution impact analysis because some of the total demand was attributed to latent demand does not make the FEIS unscientific or inadequate.

The Appellants also argue that some of the comments requested that the FEIS include a hot spot analysis and that its absence is a violation of FHWA guidance documents and agency practice in other parts of the country. Aplt. Br. at 78. However, the Appellants failed to provide any support for this claim in their opening brief. The FEIS explained that because all intersections were anticipated to perform at a service level of C or higher, no hot spot analysis was required. II Aplt. App. at 604. The FEIS is not inadequate on this basis.

L. Failure to Disclose Unresolved Issues

Relying upon 42 U.S.C. § 4332 and 23 C.F.R. § 771.125(a)(2), Appellants contend that the FEIS is inadequate for failing to disclose unresolved issues, specifically where the Agencies' own experts and consultants may have expressed disagreement. Aplt. Br. at 79. We believe that this issue has already been adequately addressed in the context of Appellants' various challenges and does not warrant discussion, particularly because

49

Appellants have failed to identify exactly which issues remain unresolved and have failed to brief the issue adequately.

M. Failure to Insure Accuracy of the FEIS

Appellants argue that the Federal Agencies involved abandoned their obligation under NEPA to evaluate submitted information independently and insure the accuracy of the FEIS. 40 C.F.R. § 1506.5(a); 23 C.F.R. 771.109(c)(1). They rely upon the lack of any independent evaluation of project costs submitted by UDOT. Aplt. Br. at 81. This issue has already been adequately addressed above and does not warrant additional analysis. See supra I.A. and II.A.

N. Failure to Insure Professional and Scientific Integrity of the EIS

NEPA imposes an affirmative duty on federal agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in the environmental impact statements." 40 C.F.R. § 1502.24. The Appellants advance that the Federal Agencies violated this duty as to the HGM model, the travel demand model ("TDM"), and by using different versions of the VMT model. Aplt. Br. at 82-85. Because we have addressed Appellants' arguments about the HGM model and use of different versions of the VMT model above, we now consider only the TDM. See supra I.I and I.K.

The WFRC's daily TDM predicts that building the Legacy Parkway will result in congestion speeds being reduced from 11.4 mph to 6.9 mph but an increase in VMT. I

Aplee. App. at 62 (correcting FEIS chart in II Aplee. App. at 780). The Appellants conclude that this result is illogical and inconsistent with the stated goals for the FEIS. The Appellees explain that "this result is tied to a change in the parameters used in the no-build and the ... build alternatives. WFRC made a rational judgment to change the parameter so that the model could more accurately reflect the public's likely response to extreme congestion," that response being that some travelers will take a more circuitous route to avoid congestion. Aplee. Br. at 74. See also IV Aplee. App. at 1333 (Response to comment on decreased congestion speed under build alternatives), 1334. The Appellees also indicate that only the daily TDM predicts lower congestion speeds under the build alternatives while the AM and PM TDMs predict higher congestion speeds under the build alternatives. Applying the rule of reason and overlooking minor technical deficiencies, the TDM does not render the FEIS inadequate. See Swanson v. United States Forest Serv., 87 F.3d 339, 343-44 (9th Cir. 1996).

O. Segmentation of Transportation Projects

Travel demand projections for the North Corridor indicate that by 2020 a range of multi-modal transportation solutions will be needed to accommodate the safe and efficient movement of people and goods. The Legacy Parkway will provide a portion of the transportation facilities needed as one element of the "Shared Solution" transportation plan. The Shared Solution also includes reconstruction and expansion of I-15 to ten lanes, and expansion of the public transit system. II Aplt. App. at 567. According to the

51

FEIS, the I-15 project "is being proposed concurrently with the Legacy Parkway," but the results of this evaluation are being reported in a separate EIS. II Aplt. App. at 551. The FEIS for the I-15 project was scheduled to be completed by mid-2000 with construction to begin in 2008 after completion of the Legacy Parkway. II Aplt. App. at 620A, 570 (FEIS). If the Legacy Parkway is not constructed, the FEIS indicates that it would not be reasonable to proceed with the I-15 project because of the "unlikely chance that any advantages whatsoever would develop compared to the extreme cost to travelers." II Aplt. App. at 570.

NEPA instructs that significant cumulative impacts are not to be made to appear insignificant by breaking a project down into small component parts. 40 C.F.R. § 1508.27(b)(7). NEPA's description of the proper scope of an EIS in 40 C.F.R. § 1508.25 instructs that (1) connected actions should be discussed in the same EIS, and (2) similar actions should be discussed in the same EIS when the best way to assess adequately the combined impacts of the similar actions or reasonable alternatives to such actions is to treat them in a single impact statement. 40 C.F.R. §§ 1508.25(a)(1), (3). A connected action is defined as being closely related to other actions and is identified based on three factors:

> (i) Automatically trigger other actions which may require environmental impact statements.
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

52

40 C.F.R. § 1508.25(a)(1). Similar actions are actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

"Generally [under NEPA], segmentation of highway projects is improper for the purpose of preparing environmental documentation." Ross v. Federal Highway Admin., 162 F.3d 1046, 1049 n.3 (10th Cir. 1998) (citing Village of Los Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477, 1483 (10th Cir. 1990)). However, the rule against segmentation is not required to be applied in every situation. To determine the appropriate scope for an EIS, courts have considered such factors as whether the proposed segment

(1) has logical termini,
(2) has substantial independent utility,
(3) does not foreclose the opportunity to consider alternatives, and
(4) does not irretrievably commit federal funds for closely related projects.

Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981) (citing cases from the 7th Cir., 9th Cir., and 8th Cir.); Ross, 162 F.3d at 1049 n.3 (applying same test to portion of a highway project that was segmented in an attempt to avoid NEPA requirements as to that portion); Village, 906 F.2d at 1483 (applying same test to local bridge in determining that it was not segmented improperly from a federal project). This test seems to come in part from 23 C.F.R. § 771.111(f). See also Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 68 (D.C. Cir. 1987). In Custer County, 256 F.3d at

53

1037, we noted that projects that have "independent utility" are not "connected actions" under 40 C.F.R. § 1508.25(a)(1)(iii). An inquiry into independent utility reveals whether the project is indeed a separate project, justifying the consideration of the environmental effects of that project alone. Piedmont, 637 F.2d at 440.

The Appellants assert that NEPA requires that a single EIS be prepared for the Legacy Parkway, the I-15 project, and the expansion of the public transit. Aplt. Br. at 86. They characterize all three projects as connected and similar actions and as interdependent parts such that the "best way" to assess adequately the combined impacts of the three components and reasonable alternatives both to and among the components is "without doubt" a single EIS. Id. at 88-89.

Appellants rely upon the FEIS:

It is not reasonable to include construction of I-15 North in the No-Build Alternative because of the unlikely chance that any advantages whatsoever would develop compared to the extreme cost to travelers. In fact, the entire cost of Legacy Parkway is economically justified, based on its value as an alternative route during reconstruction of I-15.

The Legacy Parkway is part of the Shared Solution of transportation systems management, transit, and roadways proposed for the North Corridor. The 2020 capacity needs in the North Corridor would not be met without both the Legacy Parkway and the I-15 North Improvements, even with aggressively enhanced transit. Moreover, the North Corridor transportation needs for safety and an alternate north-south route, as well as engineering and construction constraints, compel a reasonable sequencing of construction under which the I-15 North Improvements would occur after completion of the Legacy Parkway.

II Aplt. App. 570. What this tells us is that the I-15 reconstruction will not proceed

54

without the Legacy Parkway, and that Legacy Parkway's utility as an alternate route during that reconstruction alone would justify the Legacy Parkway's cost.

Applying the test contained in the regulation, 40 C.F.R. § 1508.25(a)(1)(i)-(iii), the Legacy Parkway does not "automatically trigger" the reconstruction of I-15, or the transit expansion. The Legacy Parkway may proceed without the reconstruction of I-15; the regulation views actions as connected if they "cannot or will not proceed unless other actions are taken previously or simultaneously." Here, the I-15 project will occur, if at all, subsequently.

The Appellants argue that the three components of the Shared Solution require a single EIS. The FEIS estimates that the Legacy Parkway will facilitate 16 percent of the 2020 demand, the expansion to I-15 will facilitate 8 percent, and the expanded transit will facilitate 12 percent. I Aplee. App. at 323. Each component can serve its transportation purpose whether or not the other projects are built. The components, although interrelated as part of an overall transportation plan, should individually contribute to alleviation of the traffic problems in the Northern Corridor, and are therefore not improperly segmented as separate projects. See Piedmont, 637 F.2d at 440-41 (rejecting similar argument that projects were improperly segmented). Additionally, the FEIS does not state that the I-15 project lacks independent utility from the Legacy Project. It merely points out that, without the Legacy Parkway as an alternative route, large scale reconstruction and expansion of I-15 would impede traffic to the point that the short-term

55

costs of the project would outweigh the long-term benefits. II Aplt. App. at 570.

Moreover, there is some evidence of coordination insofar as preparation of the EIS is concerned. I Aplee. App. at 1 ("While each project is considered separately, FHWA has developed a record that enabled the public and the decision makers to be aware of the relationship of the two projects to the overall transportation needs in the North Corridor by developing parallel Chapters 1 & 2 for the separate EIS's."). Given our deferential standard of review, we cannot conclude that the FEIS is deficient because the three aspects of the Shared Solution were not evaluated in a single EIS.

P. Illegal Delegation of NEPA Responsibility and Oversight

While admitting that an EIS for any major federal action funded under a program of grants to states is not legally insufficient solely because it was prepared by a state agency, see 42 U.S.C. § 4332(D),[10] the Appellants argue that this EIS is legally

---

[10] The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and . . . –
(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:
    (i) the State agency or official has statewide jurisdiction and has the responsibility for such action,
    (ii) the responsible Federal official furnishes guidance and participates in such preparation,
    (iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

insufficient because it was prepared by a state agency for a state-funded project, to be used by the COE to issue a § 404(b) permit. Aplt. Br. at 89. In the alternative, they argue that even if a state agency could prepare the EIS, the federal agencies did not sufficiently participate and independently review the work of the state agency and its contractors.

Appellants rely on <u>Sierra Club v. United States Army Corps of Eng'rs</u>, 701 F.2d 1011, 1037-39 (2d Cir. 1983), which held that the COE, as a permitting rather than a funding agency, should have prepared its own FEIS and not relied on the FEIS prepared by the state agency regardless of the FEIS's accuracy. The court determined that the indicated remedial order would have been to require the COE to prepare a completely new EIS, not merely a supplemental EIS. However, the court declined to order a new FEIS because such a remedy would have required a wasteful duplication of effort as to issues the court had found adequately treated and because relief under NEPA should not

---

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

42 U.S.C. § 4332.

be punitive. Id. at 1039.

Although 40 C.F.R. § 1506.4 ("Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.") and 40 C.F.R. § 1506.5(a) (environmental information submitted by an applicant does not have to be redone but must be verified by the agency) urge against redundancy, there appears to be stronger support in the CFR for the Appellants' and Second Circuit's positions that the wrong party prepared the EIS.

> Except as provided in §§ 1506.2[11] and 1506.3,[12] any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency .... Contractors shall execute a disclosure statement prepared by the lead agency ... specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents.

40 C.F.R. § 1506.5(c). Based on the clear language of § 1506.5(c), we hold that the COE and the FHWA erred to the extent they allowed UDOT or contractors hired by UDOT to

---

[11] 40 C.F.R. § 1506.2(b) and (c) directs federal agencies to cooperate with state and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable state and local requirements. The only relevant state requirement in this case is apparently the water quality certification. Therefore, § 1506.2 does not allow the COE or the FHWA to rely on UDOT's FEIS.

[12] 40 C.F.R. § 1506.3 allows a federal agency to adopt another federal agency's FEIS provided that the FEIS meets NEPA standards. The question of whether an agency outside of 42 U.S.C. § 4332 is entitled by 40 C.F.R. § 1506.3 to adopt a FEIS prepared for a funding agency by the state agency applicant is beyond the facts of this case. Although the FHWA is often a funding agency for the purposes of 42 U.S.C. § 4332, it is not in this case because the Legacy Parkway is a state-funded project.

prepare the FEIS.

Having determined the Agencies to have been in error, we must now consider what remedy if any is appropriate. We find Associations Working for Aurora's Residential Env't ("AWARE") v. Colorado Dep't of Transp., 153 F.3d 1122, 1127-30 (10th Cir. 1998) informative. In AWARE, the FEIS was prepared by a contractor hired by the Colorado Department of Transportation. The plaintiffs asserted that Colorado's practice of awarding final design contracts to the company who prepared the FEIS gave the contractor an incentive to promote a build alternative over a non-build alternative. They contended that this incentive qualified as a conflict of interest and placed the contractor in breach of the 40 C.F.R. § 1506.5(c) requirements. Assuming without deciding that a conflict of interest existed such that a breach had occurred, the AWARE court determined that the ultimate question was whether the breach compromised the objectivity and integrity of the NEPA process and that the district court could evaluate the oversight that the agency provided to the EIS process as a factual matter and make a determination upholding the EIS. Id. at 1129.

In this case, the district court's decision does not address this issue. Appellants include four examples in their brief which they claim demonstrates the bias and result-oriented nature of the analysis of the Legacy Parkway. These items range from criticism of the tone of the EIS as advocacy to a failure to adequately consider alternatives. Aplt. Br. 90-91. We are satisfied that this case differs from Davis v.

59

Mineta, __F.3d__, No. 01-4129, 2002 WL 1401690, *15 (10th Cir. June 20, 2002), where this court reversed the denial of a preliminary injunction holding that federal decisionmakers prejudged NEPA issues. In <u>Davis</u>, a municipality had contracted with a city for a predetermined result and the federal agencies failed to exercise independent review. <u>Id.</u> at *3. We find no such preordained result in this case–though it does merit our concern. We do not find the EIS inadequate based upon this procedural claim.

## II.     CWA

### A. D&RG Regional Alignment

The Appellants contend that the Federal Agencies applied the wrong legal standards in rejecting the D&RG alternative.  Under CWA, the test is not whether a proposed project is "better" than an alternative with less wetlands impact because it would cost less and have less impact on existing and future development.  The test is whether the alternative with less wetlands impact is "impracticable," and the burden is on the Applicant UDOT, with independent verification by the COE, to provide detailed, clear and convincing information *proving* impracticability.  Aplt. Br. at 22 (citing to selection of GSL Regional Alignment as "better" at II Aplt. App. 526 (DEIS), 568 (FEIS)).

While the Appellants are correct that CWA requires that the least damaging alternative be selected unless impracticable, they are quoting from the DEIS and the FEIS which are governed by NEPA, not CWA.  NEPA does not require the selection of the least damaging practicable alternative.  NEPA only requires that the Agencies "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  NEPA prescribes the necessary process, but does not mandate a particular result.  Robertson, 490 U.S. at 350.  Therefore, failure to select the better alternative is not a violation of NEPA.

CWA prevents the COE from issuing a § 404(b) permit if there is a less damaging practicable alternative. 40 C.F.R. § 230.10(a). Practicable is defined as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.3(q). In its ROD, the COE found the D&RG Alignment to be infeasible because of its high cost and high impact on existing development. I Aplee. App. at 44-45. Merriam-Webster's Collegiate Dictionary defines infeasible as impracticable. Id. at 618 (9th ed. 1991). Therefore, the Appellants are incorrect in saying that the Federal Agencies applied the wrong legal standard in rejecting the D&RG alternative.

The Appellants further argue that even if the impracticable test was applied, it was not met. Aplt. Br. at 23. We can set aside the COE's action only if we find that the COE abused its discretion, or acted arbitrarily, capriciously, or contrary to law. 5 U.S.C. § 706(2)(A). Impact on existing development would appear to fall within both the cost and the logistics portion of the practicable definition. For reasons discussed at I.A., we find that the COE violated its own regulations by failing to verify the cost estimates provided by the Applicant. Thus, the high cost rationale is inadequate to uphold the COE's permit decision.

Turning to the other justification, while there is evidence that the D&RG Alignment is more highly developed relative to the GSL Alignment, that evidence simply does not adequately address whether the D&RG's impact on existing development would

62

be so high that it would be impracticable.[13] See II Aplee. App. at 707.1-713, 849 (maps); II Aplee. App. at 911 (a slide presentation); II Aplee. App. at 894 (one comment submitted by a member of the public recommending that the alignment be as far west as possible to avoid gas and high voltage lines); II Aplee. App. at 943 (an e-mail between employees of the FHWA stating that impact to existing development would be severe). The burden of proof to demonstrate compliance with the § 404(b) permit Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued. 61 Fed. Reg. 30,990, 30,998 (June 18, 1996) (citing 40 C.F.R. § 230.12(a)(3)(iv)). Issuance of the permit with insufficient information concerning the D&RG Alignment was arbitrary and capricious.

B. Narrower Right of Way

The Appellants urge that the COE violated CWA by applying the wrong legal test in eliminating a narrower ROW as an alternative. Instead of requiring the Applicant to demonstrate clearly that a narrower configuration was impracticable, the COE justified the width of the ROW by explaining why the amenities would be desirable to various interests. Aplt. Br. at 31. The COE argues it reasonably concluded that a narrower ROW was not a feasible stand-alone alternative, Aplee. Br. at 36, and appropriately considered environmental, safety, and community concerns as appropriate elements of the project

---

[13] As the record stands before this court, we are unable to tell how wide the ROW would need to be in the D&RG location, how many buildings would have to be taken, how many, if any, refineries would have to be relocated, how extensive the impact would be on existing utilities, or if any mitigation would be necessary.

under review.

1. Median Width

The Appellees allege that a median of less than 65.6 feet is not a practicable alternative. The Evaluating Officer concluded in the § 404(b)(1) Evaluation Report that a narrower median was not practicable based on the following considerations: (1) the visual impact of unsightly concrete barriers; (2) the hazard created by concrete barrier required in narrower medians; (3) the water quality mitigation function of the vegetated median; (4) the public preference for a parkway type facility that requires a median; (5) failure to include the median would be inconsistent with the mitigation proposed in the FEIS; and (6) failure to include the median would be inconsistent with the land use plans of local governments which have included the project as a parkway-type facility. I Aplee. App. at 110.

However, on the next page, the Officer's Roadway Requirements list contains the following quotes: "Note: Median width also necessary to accommodate possible addition of two lanes in the median shown in FEIS, Volume 1, section 2.2.1." I Aplee. App. at 111. Although the existence of less environmentally damaging practicable alternatives must be determined in the present, the Officer's acknowledgment that the median width is also necessary for the future addition of two lanes undercuts his conclusion that anything less than a 65.6-foot median is impracticable for this four lane highway.

Regardless, the Officer's safety reason is amorphous and brought into question by

64

his Note.  It is not clear whether a median of less than 65.6 feet requires concrete barriers or only medians narrower than the average require concrete barriers.   The width under which concrete barriers are required is not quantified.  Additionally, Section 2.2.1 of the FEIS states:

> There would be ample space for the addition of two lanes in the median. The median between the northbound and southbound lanes would serve as a vegetated buffer to filter runoff and minimize concentrated discharges.  These vegetated medians would have to be maintained to satisfy water quality certification requirements.  If replacing these vegetated medians with additional highway lanes is ever proposed, environmental clearances would be necessary and replacement of the water quality functions of the vegetated medians would be required.

See also II Aplee. App. at 811 (FEIS, App. Q).  This quote from the FEIS and the "Note" from the Evaluation Report indicate that there are methods of water quality control other than a large vegetated median.  There is no evidence that the COE considered whether a substitute water quality control method was practicable in the context of a narrower median--the state water quality certification incorporating the large vegetated median was obtained after the § 404(b) permit was issued and appears to be a function of a four lane highway with a 65.6 foot median.  See Aplt. Reply Br. at 9.

As to the other reasons, the Officer justified the wider configuration by explaining why a package including several amenities would be desirable to various interests.  The CWA test is not, however, whether features of a proposal would make a more desirable project.  Rather the Applicant and the COE are obligated to determine the feasibility of the least environmentally damaging alternatives that serve the basic project purpose.  If

such an alternative exists – like a highway configuration that is much narrower because it dispenses with the amenities – then the CWA compels that the alternative be considered and selected unless proven impracticable.  UDOT's stated purpose here was to meet the 2020 travel demand for the I-15 North Corridor and the amenities are irrelevant to meeting that purpose.  We, therefore, conclude that the COE failed to assess rationally whether a narrower median is practicable, thereby rendering the issuance of the permit arbitrary and capricious on this basis.

2. Trail

In the § 404(b)(1) Evaluation, the Officer stated that the following issues were considered concerning the trail portion of the project when project features were analyzed to determine if a narrower ROW was practicable: (1) meetings were held with trail interests in which it was determined that there was a need for a trail system in the Legacy Parkway to continue the Jordan River trails; (2) the 1998 MIS stated that there was a need for a pathway system for pedestrians, bicycle-riders, and equestrians in the study area; (3) many people expressed the belief that a trail system was needed for use as an alternative means of transportation; (4) failure to include a trail in the project would be inconsistent with decisions made during and in response to the NEPA process; (5) failure to include the trail would eliminate a benefit that has been identified as needed in the context of public interest; and (6) failure to include the trail would be inconsistent with the local land use plans for the majority of cities in the study area.  I Aplee. App. at 109.  CWA

does not permit the discharge of fill material if there is a practicable alternative which would have a less adverse impact. 40 C.F.R. § 230.10(a). As discussed before, an alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." Id. § 230.10(a)(2). The project purpose of the Legacy Parkway has been repeatedly identified as meeting the 2020 transportation needs of the North Corridor. I Aplee. App. at 43-44 (COE's ROD); I Aplee. App. at 261 (FEIS); IV Aplee. App. at 1401 (State Water Quality Certification). The Evaluating Officer identified one of the functions of the trails as providing an alternative means of transportation. The COE reasonably concluded that removing the trails was not practicable in light of the project's overall purpose of meeting the transportation needs of the Northern Corridor in 2020, thus, the issuance of the permit is not arbitrary and capricious on this basis.

3. Berm and Utility Corridor

Although the Evaluating Engineer wrote that the berm portion of the project was considered when a narrower ROW was analyzed for practicability, I Aplee. App. at 109, no reason is given in the COE's ROD, § 404(b)(1) Evaluation Report or permit for why a ROW without a berm and utility corridor was not practicable. Reasons were only given for why a ROW without trails or a median was impracticable. Additionally, no explanation is given for why the ROW must be 330 feet for the entire 14 miles of the Legacy Parkway since the berm which is to be 33.1 feet is to run for only 3.2 miles. II

Aplt. App. at 625 (FEIS diagram showing ROW at 330 feet with and without presence of berm); IV Aplee. App. at 1323 (response to comment stating that berm will only run for 3.2 miles).

The CWA does not permit the discharge of fill material if there is a practicable alternative which would have a less adverse impact. 40 C.F.R. § 230.10(a). "Practicable" is considered in light of the overall project purpose. Id. § 230.10(a)(2). As noted supra II.B.2, the project purpose of the Legacy Parkway has been repeatedly identified as meeting the 2020 transportation needs of the North Corridor. The Appellees have not cited to any place in the administrative record where providing a future utility corridor was included in the project purpose of the Legacy Parkway. Consequently, we consider the future utility corridor to be merely incidental to the Applicant's basic purpose. See Sylvester v. United States Army Corps of Eng'rs, 882 F.2d 407, 409-10 (9th Cir. 1989); Shoreline Assoc. v. Marsh, 555 F. Supp. 169, 179 (D. Md. 1983). The failure of the COE to consider whether a ROW without a future utility corridor would be impracticable and the failure of the COE to provide any reasoning for why a ROW without a berm would be impracticable renders issuance of the permit arbitrary and capricious on this basis.

C. "Mass Transit" Alternative

We find that all sub-issues under Appellant's Mass Transit Alternative issue are waived for failure to adequately brief as to violations of CWA. Phillips, 956 F.2d at 954. The Appellants argue only the inadequacies of the FEIS which is governed by NEPA.

68

They make no mention of the COE's ROD, § 404(b) Evaluation Report, or § 404(b) permit which are governed by CWA. They cite only to regulations pursuant to NEPA. The Appellants' entire argument as to CWA on the mass transit alternative issue is that "[t]he District Court's holding eviscerates the alternatives analysis required ... by the CWA," Aplt. Br. at 39, and "[t]he omission of the assumptions and supportive information underlying the Federal Agencies' transit analysis violates NEPA and the CWA." Aplt. Br. at 38. We, therefore, deem this issue waived.

D. Reducing Travel Demand and Alternative Land Use Scenario Alternative

The Appellants allege that CWA was violated by COE's failure to consider reducing travel demand through alternative land use scenarios alone and in combination with public transit as a practicable alternative. The regulations passed pursuant to CWA defines a practicable alternative as "available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." 40 C.F.R. § 230.3(q). The COE found that an alternative land use scenario was not reasonable based on the fact that all of the record evidence demonstrates that the local governments in the study area are not implementing the type of coordinated planning and restrictive zoning that would be required to achieve the type of land use proposed by the Appellants. I Aplee. App. at 59. We find the COE's conclusion to be reasonable and issuance of the permit was not arbitrary and capricious on this basis. See also I.D.

69

E. Cumulative Effects of Six Lanes

The Appellants assert that CWA was violated by the COE's failure to consider the cumulative impact of a future expansion of Legacy from four lanes to six. Cumulative effects attributable to the filling of wetlands must be predicted to the extent reasonable and practicable. 40 C.F.R. § 230.11(g)(2). The permitting authority is to collect and solicit information about the cumulative impacts on the wetlands, and this information is to be documented and considered during the decision-making process concerning the evaluation of the permit application. Id. Cumulative impacts are identified as the changes in wetlands that are attributable to the collective effect of a number of individual discharges or fills of material. 40 C.F.R. § 230.11(g)(1). Although we are told that the definition of cumulative impacts given in the NEPA regulations are to be used uniformly throughout the federal government, 40 C.F.R. § 1508.1, the CWA regulations appear to define "cumulative impacts" in a different and more narrow way. Given our conclusion in Part I.C. that NEPA was not violated by the failure of the FEIS to consider the cumulative impact of a possible expansion of the Legacy to six lanes and the narrower definition for cumulative impact in the CWA regulations, we find that the decision to issue the permit was not arbitrary and capricious on this basis.

F. Failure to Consider Land Use Impacts; Failure to Consider Impacts on Salt Lake City;
   Failure to Consider Growth and Land Use Impacts on Areas North of the Legacy
   Parkway

No mention is made of CWA in the portion of Appellants' brief dedicated to these

issues. Therefore, we deem the issues waived for failure to brief as to the alleged CWA violation. Phillips, 956 F.2d at 954.

G. Failure to Consider Impacts to Wetlands

A § 404(b) permit cannot be issued if the proposed discharge will result in significant degradation of the aquatic ecosystem or if there is insufficient information to make a reasonable judgment as to whether the discharge will result in significant degradation. 40 C.F.R. §§ 230.12(a)(3)(ii), (iv). Effects contributing to significant degradation include significant adverse effects of the discharge on wildlife, special aquatic sites, stages of aquatic life and other wildlife dependent on aquatic ecosystems, and aquatic ecosystem diversity, productivity, and stability. 40 C.F.R. § 230.10(c).

The regulations pursuant to the CWA require the permitting authority to determine in writing the potential short-term or long-term effects of a proposed discharge on the physical, chemical, and biological components of the aquatic environment. 40 C.F.R. § 230.11. Such factual determinations are to be used in deciding whether a discharge will result in significant degradation and, therefore, the applicant cannot receive a permit. Impacts that should be considered in making the factual determinations and in making the finding of compliance or non-compliance include: major potential impacts on threatened or endangered species, 40 C.F.R. § 230.30(b); loss or change of breeding or nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem, 40 C.F.R. § 230.32(b); impacts to

71

sanctuaries and refuges which disrupt breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources, 40 C.F.R. § 230.40(b)(1); impacts to wetlands that are likely to damage or destroy habitat and adversely affect the biological productivity of the wetlands' ecosystem, 40 C.F.R. § 230.41(3)(b).

The Appellants contend that the COE violated CWA by its "unbelievably cursory" analysis of impacts to wetlands. Aplt. Br. at 73 (citing to III Aplt. App. at 1204-08 (§ 404(b)(1) Evaluation Report)). The Appellants have ignored the COE's analysis in its ROD and its Permit which were released on the same day as the § 404(b)(1) Evaluation Report. I Aplee. App. at 38, 124. Even assuming without deciding that the wetlands analysis in the § 404(b)(1) Evaluation Report is cursory, the wetlands analysis of all three documents is adequate to support the COE decision.

Appellants also assert that CWA was violated by the Agencies': (1) failure to classify wetlands into subcategories as required by HGM protocols; (2) failure to take actual field data for developing the functional profile; (3) assuming that land use changes within 1000 feet predicted the wetlands' level of functionality; and (4) use of the Everglades HGM Regional Guidebook. For substantially the same reasons given in Parts I.I.1.-I.I.4, we find that the COE did not act arbitrarily and capriciously in issuing the permit on this basis.

H. Failure to Consider Impacts to Wildlife

The Appellants note that the COE's wildlife impact analysis, like the FEIS, was limited to consideration of impacts within 1000 feet of the project despite the CWA regulation's requirement that written factual findings be made on the potential short-term or long-term effects of the proposed discharge on threatened and endangered species, nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem, and sanctuaries and refuges. For substantially the same reasons give in I.J., and also because practicable alternatives cannot be ignored because of mitigation potential, Fund for Animals, 85 F.3d at 544, we hold that the COE acted arbitrarily and capriciously in granting the permit on this basis.

I. Air Quality Impacts

No mention is made of CWA in the portion of Appellants' brief dedicated to this issue. Therefore, we deem this issue waived for failure to brief as to the alleged CWA violation. Phillips, 956 F.2d at 954.

## Conclusion

We affirm in part and reverse and remand in part. We find that the FEIS was inadequate on the following grounds: elimination of the D&RG as an alternative based upon inadequate cost estimates, supra I.A., failure to consider alternative sequencing of

the Shared Solution, supra I.C.6, failure to consider integration of the Legacy Parkway and transit, supra I.C.7., and failure to consider impacts to wildlife, supra I.J. We conclude that the COE's issuing of the § 404(b) permit was arbitrary and capricious on the following grounds: issuing a permit with insufficient information to determine whether the D&RG Regional Alignment was a practicable alternative, infra II.A, failure to consider whether a narrower median was a practicable alternative, infra II.B.1, failure to consider whether a ROW without a future utility corridor or berm was a practicable alternative, infra II. B.3, and failure to consider the impacts to wildlife, infra II.H.

On remand, our injunction shall remain but the bond shall be exonerated.

# Appendix

Agencies: FHWA and COE
APA: Administrative Procedure Act
Applicant: UDOT in this case
A-team: assessment team, team of experts formed to conduct HGM
BWR: A contractor hired by UDOT
CEQ: Council on Environmental Quality
CWA: Clean Water Act
COE: U.S. Army Corps of Engineers
D&RG: Denver & Rio Grande
DEIS: Draft Environmental Impact Statement
DWR: Utah Department of Wildlife Reserve
EIS: Environmental Impact Statement
EPA: Environmental Protection Agency
FEIS: Final Environmental Impact Statement
FHWA: Federal Highway Administration
FTA: Federal Transit Authority
FWS: Fish and Wildlife Service
GSL: Great Salt Lake
HEP: Habitat Evaluation Procedure
HGM: Hydrogeomorphic methodology
HDR: a contractor hired by UDOT
HOV: High Occupancy Vehicle
MIS: Major Investment Study
NAP: National Action Plan
NEPA: National Environmental Protection Act
ROD: Record of Decision
ROW: Right of Way
TDM: Travel Demand Management
TOD: Transit Oriented Development
TSM: Transportation System Management
UDOT: Utah Department of Transportation
UBT: Utahns for Better Transportation
UTA: Utah Transit Authority
VMT: Vehicle Miles Traveled
SLC: Salt Lake City
WHSRN: Western Hemisphere Shorebird Reserve Network
WFRC: Wasatch Front Region Council
WTC: Western Transportation Corridor